

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

2012 MAR -9 PM 4: 22

|  |  |
|---|---|
| NATIONWIDE LIFE AND ANNUITY INSURANCE COMPANY, | |
| Plaintiff, | **COMPLAINT** **2 : 12 cv 213** |
| v. | **Case No.** |
| EDMOND GOLDEN, Individually and as Trustee of the Edward Barry Insurance Trust, LEONARDO FILIZZOLA AGUIAR, FJ SMITH INC., JEFF RAILEY, and DOES 1 through 20, inclusive. | **JUDGE SMITH** **MAGISTRATE JUDGE KING** |
| Defendants. | |

Plaintiff Nationwide Life and Annuity Insurance Company ("Plaintiff" or "Nationwide") by and through its attorneys, hereby files this Complaint for declaratory judgment and other relief, and in support thereof, avers as follows:

1.      This is an action for fraud, negligent misrepresentation, civil conspiracy, breach of contract, violation of the Viatical Settlements Act §§3916.01 *et seq.*, and declaratory judgment pursuant to 28 U.S.C. § 2201 as a result of a fraudulent scheme directed at Nationwide in Ohio, which caused Nationwide to issue a $4.5 million insurance policy on the life of Edward F. Barry (the "Barry Policy"). Nationwide is entitled to the relief it seeks because the Policy was procured through a plan, scheme or design to transfer the beneficial interest in the Policy to stranger investors seeking to wager on the life of Edward F. Barry ("Barry"). Because an arrangement was in place prior to the issuance of the Policy to wager on the life of Barry, no insurable interest existed to support the Policy at the time it was issued. Accordingly, the Policy

was not merely an illegal wagering contract, but also the product of a fraud directed at Nationwide in Ohio. Nationwide thus seeks, *inter alia,* equitable relief in the form of a declaration that the Policy is *void ab initio* for lack of an insurable interest.

## THE PARTIES

2.      Plaintiff Nationwide is a life insurance company organized and existing under the laws of the State of Ohio, with its principal place of business and nerve center at One Nationwide Plaza, Columbus, Ohio 43215-2220. Nationwide is a citizen of the State of Ohio.

3.      Defendant Leonardo Filizzola Aguiar ("Aguiar") is an individual who, upon information and belief, is a citizen of the state of Texas who resides at 5508 Mountain Valley Drive, The Colony, Texas 75050. Aguiar was the insurance producer of the Barry Policy.

4.      Defendant Edmond Golden ("Golden") is an individual who, upon information and belief, is a citizen of the State of California who resides at 1438 Gamble Lane, Escondido, California 92029. Golden was the named trustee of the Edward Barry Insurance Trust that owned the Barry Policy at the time of issuance.

5.      Defendant FJ Smith, Inc. ("FJ Smith, Inc.") is a corporation which, upon information and belief, is organized under the laws of the State of California, with an address of 731 S. Highway 101, Suite 11, Solana Beach, California 92075. FJ Smith, Inc. is the current owner and beneficiary of the Barry Policy.

6.      Defendant Jeff Railey ("Railey") is an individual who, upon information and belief, is a citizen of the state of California who resides at 13720 Portofino Drive, Apt. B, Del Mar, California 92014. Railey is believed to be a certified accountant who was involved in verifying Barry's financial net worth to Nationwide.

7.      Nationwide joins as defendants Does 1 through 20, who are individuals and/or entities the identity of which are presently unknown.  Nationwide is unaware of the true names and capacities of the defendants sued as Does 1 through 20, inclusive, and therefore sues these defendants by such fictitious names.  Nationwide will amend this complaint to allege the true names and capacities of Doe defendants when ascertained.  Nationwide believes Does 1 through 20 have participated in the STOLI scheme as described more fully herein.  Nationwide is entitled to relief as to each of the Doe defendants in some manner under the theories described in this complaint.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332, because complete diversity of citizenship exists between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because Nationwide is a resident of this judicial district, the fraudulent scheme described in this Complaint was directed at Nationwide in this judicial district, Nationwide was damaged in this judicial district and a substantial part of the events giving rise to this claim occurred within this judicial district.

## INTRODUCTION

10.     Over the last decade, an insurance market has emerged in which investors have used traditional life insurance as a morbid and speculative investment vehicle, rather than for the income protection and estate planning purposes for which such insurance was created.

11.     In its simplest form, such an investment vehicle is created when a life insurance policy is applied for and issued at the behest of individuals or entities – with no insurable interest

in the life of the insured – who later acquire some, if not all, of the interest in the death benefit payable upon the death of the insured. Such arrangements are commonly referred to as IOLI, which stands for "investor-originated life insurance," or STOLI, which stands for "stranger-originated life insurance." (For ease of reference, these transactions are referred to as "STOLI" herein.)

12. Though the STOLI market is relatively new, the underlying concept is not; indeed, in the late nineteenth and early twentieth centuries, the United States Supreme Court opined against unlawful "wagering policies," and the "sinister counter interest" in the death of the insured that results from the issuance of such policies.

13. State insurable interest laws, which protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued, provide another safeguard against STOLI arrangements. However, STOLI speculators attempt to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible investments.

14. Logically, STOLI speculators seek out the highest anticipated rates of return when choosing the life insurance policies in which they will invest. This means the typical life insurance policy such speculators endeavor to fabricate insures the life of an individual aged seventy or older, with a net worth of over one million dollars. Such an individual can obtain large value policies, and, actuarially speaking, is expected to have a relatively limited lifespan.

15. The perverse result is that the shorter the expected lifetime of the insured, the more valuable the policy becomes to those who would gamble on his or her life; in short, a

"sinister counter interest" in the death of the insured, of the sort condemned by the Supreme Court, arises.

16.     Once the speculators locate an individual who meets their investment profile and, more importantly, will agree to collaborate in the STOLI arrangement, an application is made for one or more insurance policies.  The speculators typically pay most or all of the prospective insured's costs, including premium payments.  Some speculators even agree to pay the prospective insured a fee or other compensation upon the issuance of the policy.

17.     In many instances, STOLI policies are tainted by fraud in the application and/or other supporting documentation presented to, and relied upon by, the insurance carriers in determining whether to issue a policy.  Promoters of STOLI policies look to turn a quick profit, and frequently provide the insurer with false information during the application process in order to obtain a policy with a larger face value than would legitimately be warranted given the insured's financial circumstances.  This, in turn, maximizes the STOLI promoters' profit when the policy is sold to investors.

18.     While there are many variations, all STOLI schemes have one thing in common: their objective is to give investors with no insurable interest in the life of the insured a stake in a life insurance policy on the life of a complete stranger.

## AGUIAR'S CONTRACT WITH NATIONWIDE

19.     On or about February 4, 2009, Aguiar signed a Producer & Commission Assignment Agreement ("Producer & Commission Agreement") which permitted Aguiar to solicit applications for life insurance policies on behalf of Nationwide as an independent contractor.  *See* a copy of the Producer & Commission Agreement attached as Exhibit "A", ¶¶(a), (c).

20.     The Producer & Commission Agreement is governed by Ohio law.  *Id.* at p. 10.

21.     In the Producer & Commission Agreement, Aguiar agreed, *inter alia*, that he "shall not pay any premiums on policies other than [his own, his immediate family members] or for which [he] is a fiduciary."  *Id.* at ¶(e)(7).

22.     In the Producer & Commission Agreement, Aguiar also agreed that he "shall not, whether or not permitted by law, pay or allow any rebate of premiums or commissions in any manner, directly or indirectly."  *Id.* at ¶(f).

23.     In the Producer & Commission Agreement, Aguiar also agreed to "abide by all applicable local, state and federal laws and regulations in conducting business under [the Producer & Commission Agreement]."  *Id.* at ¶(i).

## THE BARRY POLICY TRANSACTION

24.     In or around April 2009, Barry, Aguiar, Golden, Railey, FJ Smith, Inc., and other unknown parties identified above as Does 1-20 (the "STOLI Promoters") concocted a STOLI scheme to ultimately procure from Nationwide a $4.5 million policy of life insurance on Barry, who at the time was 81 years old and retired.

### A.     The Application and Supplemental Documentation Were Submitted to Nationwide in Ohio for purposes of having Nationwide issue the Policy.

25.     Pursuant to this STOLI scheme, an application to insure the life of Barry would be submitted to Nationwide's home office in Ohio; third parties would advance and/or loan the funds necessary to pay premiums on the policy to Nationwide in Ohio, and the Policy would be taken out pursuant to a pre-conceived plan with the intent to sell it on the secondary market for life insurance, rather to provide for the legitimate insurance needs of Barry or his family (hereinafter, the "Plan").

26. In furtherance of the Plan, on or about October 3, 2008, the Edward Barry Insurance Trust (the "Trust") was created with Barry as the purported settlor and Golden as the trustee. Upon information and belief, the Trust was nothing more than a sham to facilitate the fraudulent scheme against Nationwide in Ohio.

27. In furtherance of the Plan, on or about April 8, 2009, Aguiar submitted an application for life insurance ("the Application") to Nationwide's home office in Columbus, Ohio, seeking a $4,500,000 policy insuring the life of Barry. It was understood and intended by Barry, Golden, Aguiar, Railey, FJ Smith, Inc. and other unknown parties acting in concert with them prior to, and at the time of the submission of the Application to Nationwide in Ohio, that the Barry Policy would be sold on the secondary market to investors with no insurable interest in Barry's life.

28. On or about April 8, 2009, the Application, containing Nationwide's Ohio address as the return address, was signed by Barry as the proposed insured, Aguiar as the insurance producer, and Golden as Owner.

29. Aguiar completed a producer's certification on or about April 8, 2009 which was submitted to Nationwide in Ohio wherein it was represented Barry's net worth was $14,650,000 with $804,000.00 in annual income.

30. In connection with the Application, on or about April 8, 2009, Barry and Golden signed and submitted to Nationwide's Columbus, Ohio office a Life Financial Supplement (the "Financial Supplement"). Barry represented in the Financial Supplement that in 2008, his personal net worth totaled $14,650,000. Specifically, he represented that he had personal unearned income in the amount of $804,000; cash, savings, stocks or bonds worth $6,100,000;

personal and other real estate worth $6,950,000; personal property in the amount of $350,000; and assets worth $1,500,000 from an oil and gas partnership.

31.     In signing the Financial Supplement, which contained Nationwide's Ohio address as the return address, Barry and Golden certified the following: "I understand that [] Nationwide Life and Annuity Insurance Company will rely on the above statements in determining the need and justification for the insurance applied for and I represent that all answers are true and accurate statements to the best of my knowledge and belief as of the date of application for life insurance."

32.     Question 10 on the Financial Supplement asked "Have you been involved in any discussion about the possible sale or assignment of this policy to a life settlement, viatical, or other secondary market provider?"   In response, the answer "No" was provided.

33.     Aguiar answered the same question in the producer's certification with "No."

34.     Upon information and belief, despite the responses provided on the Application and the producer's certification, Barry, Golden, Aguiar and others had been involved in discussions about the possible sale or assignment of the policy.

35.     Question 12 of the Financial Supplement asked "Will any portion of the premium for this policy be financed?"  In response, the answer "No" was provided.

36.     Again, Aguiar answered the same question in the producer's certification with a "No."

37.     Upon information and belief, despite the response provided on the Application and the producer's certification, it was intended that the premium was to be financed via a loan or an advancement from a person or entity lacking an insurable interest in Barry's life.

38.     Question 13 of the Financial Supplement asked "Will any insured or policy owner receive any payment in connection with the insurance issued on the basis of this application?  In response, the answer "No" was provided.

39.     Aguiar also answered the same question in the producer's certification with a "No."

40.     Upon information and belief, despite the responses provided on the Application and the producer's certification, it was intended that the insured or policy owner was to receive a payment in connection with the Barry Policy.

41.     On or about April 28, 2009, Barry filled out and signed Part B of the Application ("Part B"), which contained Nationwide's Columbus, Ohio and Dublin, Ohio addresses as the return addresses prominently on the first page.  Part B was likewise submitted to Nationwide's underwriting department in Ohio.

42.     By completing and signing the Application and Financial Supplement, Barry and Golden knew that truthful and accurate responses to the questions presented were required, and that Nationwide would rely upon the answers contained therein in determining whether to issue a life insurance policy on Barry's life.

43.     After Barry, Golden, and Aguiar filled out and submitted the Application and Financial Supplement to Nationwide, Barry, Aguiar and Railey corresponded with Nationwide's underwriters and agents in Columbus, Ohio and Dublin, Ohio in order to provide the remaining documents necessary for Nationwide to issue the Policy.

44.     On or about May 22, 2009, Barry contacted Nationwide requesting that the medical information received by Nationwide be released to Railey.

45.     On or about Mary 26, 2009, Nationwide from its Ohio office and in response to Barry's request, forwarded Barry's medical records to Railey.

46.     On or about June 10, 2009, in connection with a pre-policy issuance interview, Railey, who was listed as "Financial Reference/CPA" verified Barry's income and net worth as listed on the Financial Supplement.

47.     On or about June 17, 2009 and June 19, 2009, Aguiar submitted Life Insurance Illustrations signed by Barry to Nationwide's Columbus, Ohio office.

48.     On or about June 22, 2009, in reliance on the accuracy of the truthfulness of the information contained in the Application and Financial Supplement, Nationwide, through its Ohio office, issued the Barry Policy, number B500115930, insuring Barry's life for a total death benefit of $4,500,000.

49.     On or about July 20, 2009, Barry, Golden and Aguiar signed an Amendment (the "Amendment"), the original signed copy of which was to be returned to Nationwide's Columbus, Ohio address.  On the same day, Golden and Aguiar signed a Receipt of Policy ("Policy Receipt").  The Policy Receipt directed the agent, Aguiar, to return the completed and signed form to Nationwide's Columbus, Ohio address.

50.     On or about July 28, 2009, after the aforementioned deliverables and payment of premium were received by Nationwide in Columbus, Ohio, the Barry Policy was placed in force.

**B.     Premium Payments and Correspondence Directed to Nationwide's Ohio office.**

51.     On or about July 24, 2009, Golden submitted a premium payment via wire transfer to Nationwide in Ohio in the amount of $171,000.00.

52.     On or about July 27, 2009, Golden submitted another premium payment via wire to Nationwide in Ohio in the amount of $110,000.00.

53.     On or about August 12, 2009, Golden submitted a premium payment via wire to Nationwide in Ohio in the amount of $139,894.00.

54.     Although these payments purport to have been paid by the Trust, upon information and belief, the source of the premium ultimately paid to Nationwide was not Barry or any other person with an insurable interest in Barry's life.

55.     Following the issuance of the Policy, Aguiar corresponded with Nationwide's Columbus, Ohio office and received Policy Summaries, Annual Statements and Statements of Coverage from that office.

56.     On or about June 24, 2011, Golden and Jeff Keller for FJ Smith, Inc. signed an Application for Designation of Owner transferring ownership of the Policy from Golden to Keller, as President of FJ Smith, Inc.  This form referenced Nationwide's Columbus, Ohio address prominently on the front page and directed the completed and signed form to be submitted to Nationwide's Columbus, Ohio address.  On the same day, Golden and Jeff Keller for FJ Smith, Inc. signed an Application for Change of Beneficiary Designation designating F. J. Smith, Inc. as primary beneficiary.  FJ Smith, Inc. and Aguiar thereafter received correspondence from Nationwide's Policy Administration Team in Columbus, Ohio acknowledging the Change of Beneficiary.

57.     FJ Smith, Inc. received Life Insurance Premium Notices from Nationwide, directing premium checks be made payable to Nationwide's Columbus, Ohio address.

58.     On or about September 12, 2011 and December 5, 2011, FJ Smith, Inc. submitted premium checks to Nationwide in its Columbus, Ohio office in the amount of $20,310.00 and $44,120.00, respectively.

**C.     Nationwide's Death Claim Investigation**

59.     Barry died on or about October 20, 2011.

60.     On or about December 26, 2011, FJ Smith, Inc. submitted the death claim to Nationwide in its Columbus, Ohio office.

61.     Following Barry's death and the submission of a claim for the death benefit under the Barry Policy, Nationwide commenced a death claim investigation (the "Claim Investigation").

62.     As part of the Claim Investigation, Nationwide contacted Barry's son, Paul Barry, to confirm the information provided in the Application and associated documents, including, among other things, the representations regarding Barry's financial condition and the purpose of the Barry Policy.

63.     As part of the Claim Investigation, on or about January 17th and 19th, 2012, Nationwide's investigator spoke with Paul Barry, who advised that he personally augmented Barry's monthly income because his father only had income totaling approximately $950.00 per month from social security and a pension combined.

64.     Paul Barry also advised that, at the time of Barry's death, Barry had credit card debt of approximately $2,000.00 and that Barry had taken a reverse mortgage on his home with the assistance of Railey and that the home had since been repossessed.

65.     Paul Barry further confirmed that Barry never had a net worth in an amount anywhere close to $14 million as represented to Nationwide and that Barry never had the financial means to pay premiums on the Barry Policy.

66.     Paul Barry also provided Nationwide with documentation that he located in Barry's files from September 2008 evidencing that the Barry Policy was part of a scheme concocted by the STOLI Promoters to obtain life insurance on Barry's life through fraudulent

representations including those relating to Barry's net worth. That documentation includes a script providing the answers Barry should provide, including those regarding his net worth and the reason for the insurance, if an insurer contacted him regarding representations made on an application for life insurance. *See* Exhibit "B."

67.     Nationwide's ongoing investigation of these and related issues may reveal additional fraudulent representations made to Nationwide in connection with the Barry Policy and in furtherance of the fraudulent STOLI scheme.

**COUNT I**

**DECLARATORY JUDGMENT
LACK OF INSURABLE INTEREST**

68.     Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

69.     Upon information and belief, the Barry Policy was issued at the behest of, and/or procured in accordance with a plan initiated by the STOLI Promoters, none of whom possessed an insurable interest in the life of Barry under applicable law, and with the intent of transferring the Barry Policy to a STOLI investor with no insurable interest in Barry's life.

70.     Upon information and belief, the Barry Policy was procured pursuant to a plan and/or agreement predating the application for, and the issuance of, the Barry Policy to procure the policy and transfer the policy to a STOLI investor with no insurable interest in Barry's life.

71.     Upon information and belief, the purpose of the Barry Policy was to benefit one or more stranger investor in the event of Barry's death.

72.     Upon information and belief, the purpose of this transaction was to gamble upon Barry's life.

73.     As such, Nationwide is entitled to a judicial declaration that the Barry Policy lacked an insurable interest at inception and is therefore void *ab initio*.

## COUNT II

## **BREACH OF CONTRACT**

### **(Against Leonardo Aguiar)**

74.     Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

75.     Aguiar breached his Agent's Contract with Nationwide by: (i) soliciting, directly or indirectly, Barry's participation in a STOLI arrangement; (ii) submitting to Nationwide an Application that Aguiar knew lacked an insurable interest and/or contained material misrepresentations; (iii) participating in, facilitating, or directing the establishment of The Edward Barry Insurance Trust to conceal the absence of an insurable interest in connection with the Barry Policy; (iv) falsely certifying on the producer's certificate Barry's annual income and net worth; (v) falsely certifying on the producer's certificate that he had not been involved in any discussions about the possible sale or assignment of the Policy on the secondary market; that no portion of the premium would be financed; and that the insured or owner did not receive any payment in connection with the insurance issued on the basis of the Application; (vi) violating applicable local, state or federal law and regulations through involvement in the STOLI scheme; (vii) paying premiums on the Barry Policy or allowing the rebate of premiums or commissions directly or indirectly; (viii) soliciting and/or facilitating the transfer of the beneficial interest in the Barry Policy; and (ix) concealing from Nationwide that there was a lack of an insurable interest at the inception of the Policy and that the Financial Supplement and producer certificate contained material inaccuracies.

76.     As a proximate result of Aguiar's breach of the Producer & Commission Agreement, Nationwide has incurred substantial damages as a result of Aguiar's wrongful conduct and breach of contract, including, among other things, costs and expenses associated with the issuance of the Barry Policy.

77.     Furthermore, in the event that the Barry Policy is not declared void, Nationwide will incur damages in the amount of the death benefit to be paid on the Policy.  Such damages are a result of Aguiar's wrongful conduct and breach of contract.

**COUNT III**

**<u>NEGLIGENT MISREPRESENTATION</u>**

**(Against Edmond Golden, individually and as trustee of the Edward Barry Insurance Trust, Jeff Railey, and Leonardo Aguiar)**

78.     Nationwide hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

79.     Golden made or submitted statements of material fact to Nationwide by:  (i) falsely certifying in the Application for the Barry Policy and Financial Supplement, that "All of the answers and statements on this form are complete and true to the best of my knowledge and belief;" (ii) falsely certifying on the Financial Supplement Barry's net worth and total assets exceed his actual net worth and total assets; (iii) falsely certifying on the Financial Supplement that he was not involved in any discussion about the possible sale or assignment of the policy to a life settlement, viatical, or other secondary market provider; that no portion of the premium would be financed; and that the insured or policy owner would not receive any payment in connection with the insurance issued on the basis of the application.

80.     Aguiar made or submitted statements of material fact to Nationwide by:  (i) falsely certifying in the Application for the Barry Policy, the Financial Supplement and

producer's certificate, that "All of the answers and statements on this form are complete and true to the best of my knowledge and belief;" (ii) falsely certifying on the producer's certificate that the purpose of Barry's insurance was for estate succession; (iii) falsely certifying on the producer's certificate and Financial Supplement that Barry's household income exceeded $500,000 and his net worth exceeded $5,000,000; (iv) falsely certifying on the producer's certificate that he was not involved in any discussion about the possible sale or assignment of the policy to a life settlement, viatical, or other secondary market provider; that no portion of the premium would be financed; and that the insured or policy owner would not receive any payment in connection with the insurance issued on the basis of the application.

81.     Railey made or submitted statements of material fact to Nationwide by falsely verifying Barry's income and networth as listed on the Financial Supplement.

82.     Golden, Railey and Aguiar's statements of material fact were false and made without the exercise of  reasonable care or competence.

83.     Golden, Railey and Aguiar knew or should have known that each of these statements were false, or made these statements without reasonable grounds for believing them to be true.

84.     Golden, Railey and Aguiar made these statements in the course of their business, profession or employment, intending or expecting that Nationwide would be guided by these statements and rely on them in this insurance transaction.

85.     Nationwide justifiably relied on Golden, Railey, and Aguiar's statements.

86.     Nationwide lacked knowledge of the falsity of the statements.

87.     Each of the misrepresentations were material to Nationwide's decision to

issue the Barry Policy, and Nationwide justifiably relied on these misrepresentations in issuing

the Barry Policy. Indeed, Nationwide would not have issued the Barry Policy had it known the

true facts surrounding Barry's financial condition, the lack of insurable interest, and Defendants'

intent to transfer the Barry Policy or beneficial interest in the Barry Policy to a third party

investor in the secondary market.

88.     As a direct, actual and proximate result of Defendants' negligent

misrepresentations, Nationwide has incurred substantial damages, including, among other things,

costs and expenses associated with the issuance of the Barry Policy.

89.     Furthermore, in the event that the Barry Policy is not declared void, Nationwide

will incur damages in the amount of the death benefit to be paid on the Policy. Such damages

are a result of Defendants' negligent misrepresentations, which prevented Nationwide from

discovering the misrepresentations in the Application.

**COUNT IV**

**<u>FRAUD</u>**

90.     Nationwide hereby incorporates by reference each and every averment of fact

contained in the preceding paragraphs as if set forth herein at length.

91.     Defendants collectively procured the Barry Policy for the purpose of selling it on

the secondary market. In addition, each of the Defendants intentionally concealed Barry's true

financial condition from Nationwide and made the aforementioned representations knowing they

were false or with utter disregard and recklessness as to their falsity with the intention that

Nationwide would rely on them in issuing the Barry Policy.

92.     Each of the misrepresentations were material to Nationwide's decision to

issue the Barry Policy, and Nationwide justifiably relied on these misrepresentations in issuing

the Barry Policy. Indeed, Nationwide would not have issued the Barry Policy had it known the

true facts surrounding Barry's financial condition, the lack of insurable interest, and Defendants'

intent to transfer the Barry Policy or beneficial interest in the Barry Policy to a third party

investor in the secondary market.

93. Nationwide has incurred substantial damages as a result of Defendants' wrongful

conduct, including, among other things, costs and expenses associated with the issuance of the

Barry Policy.

94. Furthermore, in the event that the Barry Policy is not declared void, Nationwide

will incur damages in the amount of the death benefit to be paid on the Policy. Such damages

are a result of Defendants' collective fraud and the concealment of their fraud, which prevented

Nationwide from discovering the misrepresentations in the Application.

95. Nationwide is also entitled to an award of punitive damages based on Defendants'

collective wanton, malicious, and/or deliberate conduct described herein.

## COUNT V

## CIVIL CONSPIRACY

96. Nationwide hereby incorporates by reference each and every averment of fact

contained in the preceding paragraphs as if set forth herein at length.

97. Upon information and belief, the STOLI Promoters (specifically Golden, Aguiar,

Railey, FJ Smith, Inc. and Does 1-20) and others conspired and agreed to commit a fraud to

induce Nationwide to issue the Policy by, among other things, maliciously combining,

participating in, facilitating, and/or directing the: (i) solicitation of Barry to participate in the

STOLI scheme; (ii) submission of the Application and related documents to Nationwide; (iii) use

of the Trust to conceal the absence of an insurable interest in connection with the Policy in violation of applicable insurance laws; (iv) concealment from Nationwide that there was a lack of an insurable interest at the inception of the Policy; and (v) the completion and concealment from Nationwide of the Transfer of the Trust's beneficial interest.

98.     Upon information and belief, in furtherance of their collaborative and conspiratorial combination and agreement to commit a fraud against Nationwide, the STOLI Promoters knowingly and purposefully concealed the lack of any insurable interest in connection with the Policy and knowingly and purposefully placed (and/or caused to be placed) false information on the Application in order to induce Nationwide to issue the Policy. At all material times hereto, the STOLI Promoters acted in furtherance of a common plan, scheme, or design intended to benefit themselves and profit from the scheme at the expense of Nationwide.

99.     Upon information and belief, the STOLI Promoters knew of their own concealment, and that of their co-conspirators, regarding the lack of insurable interest and the fraudulent misrepresentations made in connection with the Policy. Further, each knew that Nationwide would rely on these acts in determining whether to issue the Policy. The STOLI Promoters furthered this conspiracy by, among other things, concealing the lack of any insurable interest in the Policy by providing false information on the Application and/or failing to correct false information, and providing the funds required to procure and maintain the Policy.

100.     Nationwide has incurred substantial damages as a result of Defendants' wrongful and malicious conduct, including, among other things, costs and expenses associated with the issuance of the Barry Policy.

101.     Furthermore, in the event that the Barry Policy is not declared void, Nationwide will incur damages in the amount of the death benefit to be paid on the Policy. Such damages

are a result of Defendants' collective fraud and the concealment of their fraud, which prevented

Nationwide from discovering the misrepresentations in the Application.

## COUNT VI

## VIOLATIONS OF OHIO'S VIATICAL SETTLEMENTS ACT

102.     It is a violation of the Ohio Viatical Settlements Act, O.R.C. § 3916.01 *et al.* ("the

Act") for any person to (i) enter into a viatical settlement contract prior to the application for or

issuance of a policy that is the subject of the viatical settlement contract; (ii) solicit, market or

otherwise promote the purchase of a policy for the purpose of or with an emphasis on selling the

policy; or (iii) enter into a viatical settlement contract within a five-year period commencing with

the date of the issuance of the policy, unless certain conditions are met.

103.     The Act prohibits certain fraudulent viatical settlement acts by any person who,

knowingly and with intent to defraud and for the purpose of depriving another of property or for

pecuniary gain, commits or permits any of its employees or agents to commit such fraudulent

acts including, among other things, presenting, causing to be presented, or preparing with

knowledge or belief that it will be presented to an insurer, insurance broker, agent, or any person,

any false information, or concealing any material information, as part of, in support of or

concerning a fact material to: (i) an application for the issuance of a viatical settlement contract

or a policy; (ii) the underwriting of a viatical settlement contract or a policy; (iii) a claim for

payment or benefit pursuant to a viatical settlement contract or a policy; (iv) any premiums paid

on a policy; or (v) any payments and changes in ownership or beneficiary made in accordance

with the terms of a viatical settlement contract or a policy.

104.     It is also a violation of the Act to recklessly enter into, negotiate, broker or

otherwise deal in a viatical settlement contract involving a policy that was obtained by presenting

false, deceptive, or misleading information of any fact material to the policy, or by concealing

information concerning any fact material to the policy, for the purpose of misleading and with the intent to defraud the issuer of the policy, the viatical settlement provider or the viator.

105.    The Barry Policy was issued on June 22, 2009.   Upon information and belief, the STOLI Promoters, specifically, Golden, Aguiar, Railey, FJ Smith, Inc. and Does 1-20, conspired together, prior to the issuance of the Policy, to fraudulently induce Nationwide to issue a Policy in reliance on their fraudulent material misrepresentations; and to arrange for the financing and sale of the Policy on the secondary market in violation of insurable interest laws and the Act.

106.    Upon information and belief, the STOLI Promoters violated § 3916.16 of the Act by entering into a viatical settlement contract prior to the application for or issuance of the Barry Policy; by soliciting, marketing or promoting the purchase of the Policy for the purpose of selling it; and entering into a viatical settlement contract in violation of the Act.

107.    Upon information and belief, the STOLI Promoters violated § 3916.171 of the Act by presenting, causing to be presented or preparing with knowledge or belief that it would be presented to Nationwide or any other person or entity, false material information regarding, among other things, Barry's finances, the source of the premiums for the Barry Policy; and concealing the Promoters' intent to transfer the Policy in connection with the application for the issuance of the viatical settlement contract or Policy; the underwriting of the Policy; a claim for payment or benefit pursuant to the Policy, any premiums paid on it; or any payments and changes in ownership or beneficiary made in accordance with the terms of a viatical settlement contract or Policy.

108.    Upon information and belief, the STOLI Promoters recklessly entered into, negotiated, brokered or otherwise dealt in a viatical settlement contract involving the Policy which was obtained by presenting false, deceptive, or misleading information of facts material to

the Policy, and by concealing Barry's financial condition which was material to Nationwide's decision to issue the Policy, for the purpose of misleading and with the intent to defraud Nationwide.

109.    In addition to the violations of the Act mentioned above, upon information and belief, the STOLI Promoters committed additional fraudulent acts in violation of the Act which will be uncovered with the benefit and opportunity for discovery in this case.

110.    Defendants' conspiratorial agreements and acts, as outlined above and which will be uncovered with the benefit and opportunity for discovery, violated provisions of the Act and constituted unlawful, unfair and deceptive trade practices within the meaning of § 3916.21.

111.    As a result of Defendants' material misrepresentations, Nationwide has incurred substantial damages, including, among other things, costs and expenses associated with the issuance of the Barry Policy.

112.    Furthermore, in the event that the Barry Policy is not declared void, Nationwide will incur damages in the amount of the death benefit to be paid on the Policy.  Such damages are a result of Defendants' collective fraud and the concealment of their fraud, which prevented Nationwide from discovering the STOLI Promoters' violation of the Act and the misrepresentations in the Application.

## RELIEF REQUESTED

WHEREFORE, Nationwide respectfully requests the entry of an Order by this Court as follows:

A.    Declaring the Barry Policy void *ab initio* due to a lack of insurable interest at the inception of the Barry Policy and that Nationwide is entitled to retain some or all of the premiums paid in connection with the Barry Policy;

B.      Declaring that Defendants are estopped from seeking a return of the premiums paid in connection with the Barry Policy due the fraudulent nature in which the Barry Policy was procured;

C.      An award of compensatory damages as warranted under law.

D.      An award of punitive damages as warranted under law.

E.      An award of attorneys' fees and costs, as determined by the Court and associated with seeking this judgment; and

F.      An award of such further relief as this Court deems appropriate.

Respectfully submitted,

*/s/ Rachel L. Lawless*
Rachel L. Lawless (#0085173)
280 N. High St., #1010
Columbus, Ohio 43215
280 North High Street, Suite 1010
Columbus, Ohio 43215
(614) 677-7861 Telephone
(614) 249-8752 Fax
Lawlesr1@nationwide.com

*Of Counsel*
Charles J. Vinicombe
Nicole C. Wixted
**DRINKER BIDDLE & REATH LLP**
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
(215) 988-2700
Charles.Vinicombe@dbr.com
Nicole.Wixted@dbr.com

*Attorneys for Plaintiff, Nationwide Life and Annuity Insurance Company*